AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means



| | |
|---|---|
| **LODGED**<br>CLERK, U.S. DISTRICT COURT<br><br>08/17/2021<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____ AP _____ DEPUTY | **FILED**<br>CLERK, U.S. DISTRICT COURT<br><br>8/18/2021<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: _____ D.C. _____ DEPUTY |

# UNITED STATES DISTRICT COURT
for the
Central District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the* )
*person by name and address)* )
The Premises known as: )
)
The property known as: SUBJECT PREMISES )

Case No. 5:21-mj-00533

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

The SUBJECT PREMISES known as: 151 Drake Street, Apartment 30D, Pomona, California

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, U.S.C. §§ 841(a)(1); 846, and 843(b) | See attached affidavit. |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Pursuant to Fed. R. Crim. P. 4.1
*Applicant's signature*

Dante Matthews, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: August 18, 2021

*Judge's signature*

City and state: Riverside, CA

Honorable Magistrate Judge Shashi H. Kewalramani
*Printed name and title*

AUSA: Peter Dahlquist

## **AFFIDAVIT**

I, Dante Matthews, being duly sworn, declare and state as follows:

### **I.  PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint and arrest warrant against Luis Gerardo Morales, also known as "Mora" ("MORALES"), for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(v) (Distribution of 1 Gram or More of Lysergic Acid Diethylamide ("LSD")).

2.   This affidavit is also made in support of an application for a warrant to search the property at 151 Drake Street, Apartment 30D, Pomona, California (the "SUBJECT PREMISES"), as described more fully in Attachment A.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy and Attempt to Distribute Controlled Substances), and 843(b) (Use of Communication Facility to Commit a Felony Controlled Substance Offense) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest

warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).  I am empowered to conduct investigations of, and to make arrests for, federal felony offenses enumerated in 18 U.S.C. § 2516.

6.    I am a Special Agent ("SA") of the Drug Enforcement Administration ("DEA") and have been so employed since September 2020.  I am currently assigned to the Los Angeles Field Division, Riverside District Office, in Riverside, California, and my responsibilities include investigating large-scale drug trafficking organizations operating in the Southern California area and elsewhere.

7.    I attended the DEA fourteen-week training academy located in Quantico, Virginia.  While at the DEA training academy, I received formal training in investigative techniques, drug identification, and the laws pertaining to drug investigations.  I have received on-the-job training from supervisors, and other agents regarding the illegal trafficking of controlled substances.  Prior to employment as a Special Agent, I was employed as a Border Patrol Agent, where I attended a twenty-week training academy at the Federal Law Enforcement

Training Center in Artesia, New Mexico, and then assigned to the
Tucson Sector, Ajo Border Patrol Station for two years.

8.   By virtue of my employment as a Federal Agent, I have
participated in drug investigations, which have included the use
of confidential sources and undercover officers, physical
surveillance, electronic surveillance, the execution of search
and arrest warrants, telephone toll analysis, the arrests of
drug traffickers, and the analysis of seized records, physical
evidence, and taped conversations.  Over the course of my
employment as a law enforcement officer, I have participated in
investigations that involve one or all of the following crimes:
possession, distribution, possession with intent to distribute,
and manufacture of controlled substances; and international
human and drug smuggling.  I have assisted in the execution of
multiple search warrants and have spoken with defendants,
confidential informants, and other witnesses who have extensive
knowledge of large-scale narcotics trafficking organizations.
In addition, I have spoken with other experienced narcotics
investigators concerning the methods and practices of drug
traffickers.

9.   Based on my training and experience, my conversations
with other law enforcement personnel, and my own participation
in this investigation, I have become familiar with the criminal
activities of individuals involved in drug trafficking
organizations, including drug manufacturing, drug distribution,
and money laundering.  I am also aware of the tactics and they
methods employed by such individuals to avoid detection by law

enforcement, including the use of multiple wireless telephones, pre-paid cellular telephones, cloned communication devices, debit calling cards, public pay telephones, counter-surveillance techniques, false or fictitious identities, coded and ambiguous language in conversations, multiple vehicles, and vehicles with concealed compartments.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

10.  DEA identified MORALES as the Snapchat drug dealer who was the likely source of a fatal dose of fentanyl that caused the overdose death of a 24-year-old man in Ontario, California. DEA identified MORALES through a confidential witness ("CW1"), a drug user who purchased four pills of fentanyl from MORALES. CW1 shared one pill with the victim and the victim died from mixed drug toxicity soon after.  CW1 reported that he/she purchased four pills, including the pill he/she shared with the victim, from MORALES for $80.  Further investigation confirmed MORALES received $80 from a cash transfer application from CW1 on the date and time CW1 reported.

11.  After discovering the pill CW1 shared with the overdose victim caused the victim's death, CW1 agreed to cooperate with law enforcement and purchased more pills from MORALES at the direction of law enforcement.  On December 1, 2020, MORALES sold CW1 119 pills.  Further testing at the DEA laboratory confirmed those pills weighed 13.164 grams and contained fentanyl.  MORALES told CW1 during the audio-recorded controlled purchase that some of the pills he provided were from a batch that "smack stronger."  Based on my training and

experience, I believe this statement about the potency of the pills shows MORALES had reason to believe the pills he was selling were not legitimate Percocet pills and suggests he knew the pills he was selling contained fentanyl.

12.   During the DEA investigation, San Bernardino County Sheriff's Office ("SBSO") arrested another confidential witness ("CW2"), a drug dealer who identified MORALES as his/her supplier.  CW2 then agreed to buy narcotics from MORALES at the direction of law enforcement.  On July 9, 2021, MORALES sold CW2 one dropper bottle filled with liquid and a piece of aluminum foil with blotter paper.  Further testing by the DEA laboratory confirmed that the substance weighed 3.788 grams and contained LSD.

13.   After the December 1, 2020, controlled purchase involving CW1, investigators followed MORALES to the SUBJECT PREMISES.  Investigators further surveilled MORALES at the SUBJECT PREMISES in the Spring of 2021.  Then on July 9, 2021, investigators surveilled MORALES driving to the SUBJECT PREMISES before meeting with CW2 for a controlled purchase.

14.   On August 13, 2021, investigators conducted surveillance on MORALES and watched MORALES enter the SUBJECT PREMISES.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

15.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. DEA Identifies MORALES as a Drug Dealer on Snapchat Who Distributed a Fatal Dose of Fentanyl That Resulted in Overdose Death

16. On August 9, 2020, at 11:40 p.m., the Ontario Fire Department ("OFD") and the Ontario Police Department ("OPD") responded to provide medical care to a 24-year-old man who was not breathing.  The man, R.S.H. ("the Decedent"), was transported to San Antonio Regional Hospital and was pronounced deceased.  The SBSO Coroner Division performed an autopsy and identified the cause of death as acute fentanyl toxicity.  The toxicology laboratory stated that there were 7.9 ng/mL of fentanyl in his femoral blood, 24 mg/dL of ethanol, 47 ng/mL of alprazolam, 3.1 ng/mL of 11-hydroxy delta-9 THC, 14 ng/mL of delta-9 carboxy THC, and 5.2 ng/mL of delta-9 THC.

17. After learning of the cause of death, the Decedent's mother, S.H., contacted SBSO and requested to speak to investigators.  On October 20, 2020, SBSO Detective Ryan Browsowski spoke to S.H. in an audio-recorded interview at her home in Claremont, California.  S.H. told Detective Browsowski that the Decedent ingested a pill he thought was Percocet while sitting inside a car with H.S.'s daughter, J.L. and one other person, CW1.[1]

18. On October 21, 2020, DEA SA Marco Garza and SBSO Detective Browsowski spoke with J.L. during an audio-recorded

---

[1] CW1 has been working with the DEA since 2020 and is cooperating with the hope for judicial leniency in the event he is charged with a crime. CW1's criminal history includes one prior state arrest for possession of a controlled substance but no prior convictions.  CW1 is not currently on probation or parole.

interview at the Rancho Cucamonga Police Station in Rancho
Cucamonga, California.  J.L. explained she took her brother, the
Decedent, to meet with CW1.  J.L. stated that CW1 and the
decedent both snorted part of a prescription pill that J.L.
believed CW1 had purchased from an illegal pill dealer known as
"Mora."

  19.  On November 4, 2020, DEA SA Melanie Clark, along with
SBSO Detectives Browsowski and S. Tarver, met with CW1.
Investigators asked CW1 what happened the night the Decedent
died.  CW1 stated that he/she was aware that the Decedent died
as a result of a fentanyl overdose.  CW1 stated that he/she met
the Decedent on August 9, 2020 (the date of the overdose death),
after being introduced to the Decedent by the Decedent's sister,
J.L.  CW1 met with J.L., the Decedent, and J.L.'s ex-boyfriend
in front of CW1's home on August 9, 2020.  That day, CW1, J.L.,
and the Decedent spent time in a car in front of the CW1's
house.  Inside the car, CW1 stated that he/she shared a "perc"
with the Decedent.  CW1 described the "perc" as a light blue,
small, round pill with "M" imprinted on one side and "30"
imprinted on the other.  Based on my training and experience, I
know that a "perc" is usually a slang term for a Percocet pill.
CW1 stated that he/she crushed the pill and snorted
approximately three quarters of the pill, and the Decedent
snorted approximately one quarter of the pill.  CW1 stated that
he/she purchased the pill he/she provided the Decedent from
"Mora."  CW1 stated he/she made the purchase of pills from

"Mora" on or around August 7, 2020 as part of a larger batch of
four pills.

20. CW1 stated "Mora" was an acquaintance that CW1 met
through mutual friends on Snapchat. CW1 stated that "Mora"
added CW1 on Snapchat and CW1 later contacted "Mora" on Snapchat
asking to buy pills. CW1 stated that "Mora's" Snapchat account
he uses to communicate with others about selling pills was
linked to MORALES's email address and phone number.
Investigation in this case revealed that the subscriber
information for "Mora's" Snapchat account included the email
address qccprop215@gmail.com, with a recovery email address in
MORALES's name and a phone number subscribed to MORALES. CW1
stated that he/she could contact "Mora" at any time to purchase
counterfeit pills. CW1 described "Mora" as a Hispanic male,
approximately 5'11", average to stocky build, approximately 180
pounds, and with thick dark hair. CW1 stated that he had seen
"Mora" drive a white Lexus and a silver "sporty" sedan. As
outlined further below, during surveillance, investigators
observed MORALES drive a white Lexus and a silver Nissan 350Z.

21. CW1 stated that he/she believed "Mora" was a large-
scale supplier of illicit pills because he/she had seen "Mora"
with bundles of money and because "Mora" rarely sold in amounts
less than $1,000. CW1 stated the largest amount he/she bought
from MORALES was $600 worth of illegal pills. CW1 stated that
he/she was able to buy smaller quantities of illicit pills from
"Mora" in previous buys, including an $80 purchase which was the
batch of illicit pills that led to the overdose death of the

Decedent.  CW1 stated that he/she knew that the pill used by the Decedent was one bought from "Mora" because August 7, 2020, was the last time he/she bought pills from "Mora."

22.   CW1 reported that he had lost his cell phone that he was using at the time of the August 7, 2020 transactions, but J.L. provided investigators with a screenshot of a CashApp transaction receipt dated August 7, 2020, which she reported CW1 provided to her, showing $80 transferred from CW1 to the CashApp account "$MORAAGANG."  The screenshot receipt from CashApp noted that the transaction was for "shoes."  Based on my training and experience, I know that drug dealers and users often use coded language for the descriptions of money application transactions. CashApp records showed that the account "$MORAAGANG" was created by MORALES.  CashApp records also showed a transaction on August 7, 2020 to MORALES for "shoes" that matched with the screenshot J.L. previously provided to investigators.  The CashApp account was also linked to a phone that is subscribed to "Gerardo Morales."  The phone number linked to this CashApp account was not the same number MORALES uses to communicate about drug transactions.

**B.   MORALES Sells Fentanyl Pills to CW1 During Controlled Purchase**

23.   On December 1, 2020, Riverside District Office ("RDO") DEA and SBSO arranged the purchase of $1,000 worth of counterfeit "M30" pills from MORALES.  Because CW1 had MORALES's phone number (which was a different number than the one MORALES had linked to his CashApp account), Detective Browsowski

instructed CW1 to contact MORALES by text to ensure screenshots could be taken without notifying MORALES.  Subscriber information for the phone number that CW1 had for MORALES showed that the phone number was associated with a pre-paid service phone, with no subscriber name.  The subscriber information did show the phone was subscribed to MORALES's email address qccprop215@gmail.com.  CW1 sent text messages to MORALES and provided investigators with a screen shot of the messages he/she exchanged with MORALES.

24.  At approximately 10:30 a.m., on December 1, 2020, CW1 met with investigators.  Investigators provided CW1 $1,000 to purchase pills from MORALES.  At approximately 11:01 a.m., CW1 contacted MORALES and confirmed that they would meet at the "Normal spot that Wendy's," referring to the place that MORALES and SW1 had previously met for drug deals.  MORALES replied to CW1 via text message saying, "U want 1k worth?"  At approximately 11:05 a.m., MORALES called CW1 to change the meeting location to 101 E. Foothill Blvd, Pomona, California.

25.  At approximately 11:06 a.m., SBSO and DEA investigators set up surveillance at 101 E. Foothill Blvd, a commercial property.  At approximately 11:25 a.m., CW1 arrived at the 101 E. Foothill Blvd parking lot.  Investigators saw that there were no other vehicles in the immediate area around CW1's vehicle.  At approximately 11:33 a.m., SBSO Detective L. Sandoval saw a sliver 2003 Nissan 350Z, with the California license plate number 8RSZ731 (the "Nissan"), enter the parking lot and park in front of CW1's vehicle.  Investigators learned

from California vehicle registration records that the Nissan was registered to MORALES. Detective Sandoval saw CW1 get out of his/her vehicle and walk to the driver's side window of the Nissan. Detective Sandoval saw CW1 talk through the driver's side window briefly. Detective Sandoval then saw CW1 get into the passenger seat of the Nissan. Detective Sandoval identified MORALES as the driver of the Nissan by reviewing MORALES's driver's license photograph. Detective Sandoval was also able to take a picture of the Nissan as CW1 got into and out of the Nissan. That photograph shows MORALES's face, but the interior of the car is dark, and the picture was taken at a distance:



26.   During the meeting with MORALES, CW1 wore an audio-recording device.  The recording of the meeting captured MORALES asking CW1 if he/she was going to "sell them," referring to the pills MORALES was selling CW1.  MORALES later told CW1 "this is the old batch and this is the new batch," referring to sets of pills in two different baggies.  Referring to one of the baggies, MORALES said, "these smack stronger."  MORALES then told CW1 to be careful.  Based on my training and experience, I know that this conversation between MORALES and CW1 indicates that MORALES was aware that some of the counterfeit pills he sold to CW1 were stronger than the rest and posed a greater overdose risk.

27.   At approximately 11:40 a.m., Detective Sandoval saw CW1 walk back to his/her car and leave the parking lot.  CW1 met with investigators after the deal at approximately 11:46 a.m.  CW1 gave SBSO investigator Tarver two plastic baggies containing blue circular shaped pills marked "M30" and a small plastic bottle containing an unknown liquid that he/she had received from MORALES.

28.   At approximately 11:40 a.m., Detective Sandoval saw the Nissan back out of the parking space and leave the parking lot, turning southbound on North Garey Avenue.  Inland Regional Narcotics Enforcement Team (IRNET) Air pilots maintained continuous mobile surveillance on the Nissan.  At approximately 11:43 a.m., IRNET Air saw the Nissan enter the east driveway of the apartment complex where the SUBJECT PREMISES was located.  IRNET Air saw the Nissan drive into the furthest north two-car

garage in the second set of double two-car garage structuresfrom Drake Street.  IRNET Air then saw MORALES walk out of the garage, close the door, and walk to the north side of the second apartment structure north of Drake Street.  That garage was later identified as a garage with a grey roll-up door facing east and the numbers "129" and "130" above it with white numbers.  At that time, IRNET Air was not able to see which specific apartment MORALES entered.

29.  On January 8, 2021, the DEA Southwest Laboratory analyzed the chemical content of the M30 pills purchase by CW1.  The laboratory confirmed that the pills weighed 13.164 grams contained fentanyl.

30.  Prior to the controlled purchase, the Honorable Judge Alexander Martinez of the Superior Court of the County of San Bernardino, State of California, signed a prospective cell-site warrant for the telephone number MORALES had used to coordinate the drug deal with CW1.  GPS data for that telephone number showed that that phone was in the vicinity of 101 E. Foothill Blvd, Pomona, California, the drug deal location, during the time of the drug deal.

**C.    MORALES Agrees to Provide More Pills to CW1 in Text Messages**

31.  On February 25, 2021, at the direction of investigators, CW1 sent a text message to MOARLES to set up a controlled purchase of illegal pills.  MORALES agreed to meet CW1, who requested to purchase $2,000 worth of illegal pills, by replying "bet" to the request.  "Bet" is a term that CW1 knew to

be a slang term for "yes."  GPS and cell tower data for
MORALES's phone showed his phone was in the vicinity of
apartment complex of the SUBJECT PREMISES while MORALES was
texting CW1 about the sale of illegal pills.  After originally
agreeing to meeting, MORALES stopped responding to messages and
the operation was cancelled.

32.  On March 2, 2021, MORALES texted CW1 "Yo," but then
did not respond further to reply messages from CW1.

33.  On March 8, 2021, CW1 texted MORALES and requested to
meet MORALES at 11:00 a.m. on March 9, 2021 to buy illegal
pills.  MORALES texted back saying, "Okay got you."  MORALES
initially did not respond further, but later requested to meet
CW1 at 6:00 p.m.  MORALES did not show up to either meeting or
respond to text messages from CW1.

34.  On March 10, 2021, MORALES text messaged CW1 and
stated, "My bad I was busy, I got you at 6ea if you want."  CW1
knew "6ea" to mean for $6 per pill.

**D.  SBSO Identifies Drug Dealer, CW2, Who Names Morales as His Supplier**

35.  On June 16, 2021, Officers arrested CW2 for
distribution of controlled substances and transported CW2 to
SBSO Rancho Cucamonga substation to be interviewed.[2]  During a
recorded interview with CW2, CW2 informed SBSO Deputy Marrujo
that CW2 buys his/her drugs in bulk to resell from MORALES.

---

[2] CW2 has been working with the SBSO since 2021 and is
cooperating with the hope for judicial leniency in the event he
is charged with a crime. CW2's does not have any prior criminal
history.  CW2 is not currently on probation or parole.

36. On June 18, 2021, SBSO Deputy Marrujo, Detective
Browsowski, and I met with CW2 to discuss his/her relationship
with MORALES and to set up a controlled purchase with MORALES.

**E.   MORALES Sells LSD to CW2 and Undercover DEA Agent
During Controlled Purchases**

37. On July 9, 2021, RDO DEA and SBSO arranged the
purchase of $700 worth of Lysergic Acid Diethylamide ("LSD")
from MORALES. CW2 provided SBSO Deputy Marrujo and me with the
Instagram account "moraamoney," which CW2 had used to arrange
for purchase of drugs from MORALES on previous occasions. At
the direction of SBSO and myself, CW2 sent a message to MORALES
via Instagram asking to purchase two vials of liquid LSD and 100
LSD gel tabs. Through my training and experience, I know that a
tab of LSD is a unit of measurement used to describe one dose of
LSD. CW2 provided investigators with a screen shot of the
messages he/she exchanged with MORALES.

38. On July 8, 2021, at approximately 1:30 p.m., CW2
messaged MORALES at the direction of SBSD Deputy Marrujo. At
approximately 4:06 p.m., MORALES responded to CW2. CW2 asked to
buy one vial of liquid LSD and 100 LSD gel tabs for
himself/herself, and one vial of liquid LSD for his/her cousin.
MORALES agreed to meet the next day on July 9, 2021, and asked
for CW2's full order.

39. At approximately 7:51 a.m. on July 9, 2021, CW2
messaged MORALES on Instagram, asking to meet at noon or 1:00
p.m. At approximately 11:03 a.m., MORALES confirmed the time
and gave CW2 a total price of $700 dollars for the LSD.

40.  At approximately 12:13 p.m., DEA investigators established surveillance near the SUBJECT PREMISES and a shopping center identified in previous surveillance as frequented by MORALES near 915 West Foothill Boulevard, Claremont, California.

41.  At approximately 12:13 p.m., DEA Task Force Officer ("TFO") Javier Rodriguez observed a silver 2006 Lexus IS250 ("the Lexus"), with California license plate number 5UAM638, registered to "Gerardo C. Morales," behind the businesses near 921 West Foothill Boulevard, Claremont, California.

42.  At approximately 12:23 p.m., MORALES messaged CW2 saying that he was coming from "210 and Carnelian."  Based on my map analysis, I concluded that MORALES was referring to the cross streets, California Highway 210 and Carnelian Street, which intersect in Rancho Cucamonga, California.  CW2 then messaged MORALES asking him to meet at Graziano's Pizza at 9255 Base Line Road, Rancho Cucamonga, California.

43.  At approximately 12:30 p.m., TFO Rodriguez observed the Lexus drive away from the 921 West Foothill Boulevard location.  Investigators maintained continuous mobile surveillance of the Lexus as it returned to the SUBJECT PREMISES.  At approximately 12:36 p.m., DEA SA Jessica Lohner observed MORALES exit the Lexus and walk towards the apartments.

44.  At approximately 12:50 p.m., I searched CW2 to ensure CW2 did not bring anything to the meeting.  SBSO Deputy Marrujo gave CW2 $700 of funds to purchase LSD from MORALES, and gave a DEA SA acting in an undercover capacity ("UC"), $800 to buy

extra LSD from MORALES if the opportunity arose.  I also placed a recording device on CW2 to record the conversation during the drug deal.  At approximately 12:58 p.m., CW2 and the UC drove to Graziano's Pizza at 9255 Base Line Road, Rancho Cucamonga, California.

45.  At approximately 1:05 p.m., SA Lohner observed MORALES walk back from the direction of the SUBJECT PREMISES and get back into the Lexus.  SA Lohner watched MORALES drive away from the SUBJECT PREMISES in the Lexus.  IRNET Air units assisted as investigators maintained continuous mobile surveillance on the Lexus.

46.  At approximately 1:14 p.m., IRNET Air observed the Lexus pull into a parking lot and park near 6644 Carnelian Street, Rancho Cucamonga, California.  Around the same time, MORALES messaged CW2 saying "way," which is a commonly-used abbreviation for "where you at."  CW2 replied to MORALES telling him that CW2 was parked in the lot of Graziano's Pizza, and gave a description for the UC vehicle that the UC and CW2 were using.  At approximately 1:17 p.m., MORALES messaged CW2 asking to meet at a US Bank branch at 6644 Carnelian Street, Rancho Cucamonga, California.  I directed CW2 to reply to MORALES and ask to keep the meeting location at Graziano's Pizza.  MORALES refused to meet with CW2 at Graziano's Pizza, after which, at my direction, CW2 agreed to meet MORALES at the US Bank branch.

47.  At approximately 1:44 p.m., the UC and CW2 drove to the US Bank branch at 6644 Carnelian Street, Rancho Cucamonga, California.  At approximately 1:50 p.m., SA Ivan Rodriguez

observed UC and CW2 park the UC vehicle near the U.S. Bank.  SA
Rodriguez observed the UC and CW2 get out of the UC vehicle and
walk towards the south entrance of the US Bank.  The UC heard a
car horn honk twice from the US Bank parking lot.  The UC
observed MORALES in the Lexus to be the one honking to signal
the UC and CW2 toward the Lexus.  The UC and CW2 waved to
MORALES and walked over to the Lexus and the UC got a clear view
of MORALES and was able to identify him.  The UC then remained
outside of the Lexus while observing CW2 get in the front
passenger seat of the Lexus.  I heard CW2 over the body-worn
audio transmitter telling MORALES why CW2 was buying the LSD and
that CW2 was going to show the UC how to "lay a sheet."  I know
from my training and experience that laying a sheet is slang
used by drug dealers to describe distributing bulk LSD into
individual doses.  At approximately 1:52 p.m., the UC observed
CW2 get back out of the Lexus with a green zip lock bag with a
small rectangular shaped piece of folded aluminum foil and a
blue dropper bottle filled with liquid in his/her hand.  The UC
and CW2 walked back to the UC vehicle and the UC directed CW2 to
place the green zip lock bag into the UC vehicle's glove box.
The UC then took custody of the green zip lock bag and its
contents and processed it according to DEA policy.

    48.  After the transaction, SA Rodriguez observed the Lexus
back out of its parking space and drive away from the parking
lot.  Investigators maintained continuous mobile surveillance of
the Lexus.  At approximately 2:13 p.m., SA Rodriguez observed
the Lexus drive back to the businesses at 921 West Foothill

Boulevard, Claremont, California, at which point, surveillance was terminated.

49.   On July 28, 2021, the DEA Southwest Laboratory analyzed the chemical content of the liquid in the blue dropper bottle and folded piece of aluminum foil purchased by CW2.  The laboratory confirmed that the liquid and blotter paper weighed 3.788 grams and contained LSD.

**F.    Both CW1 and CW2 Report MORALES Possesses Firearms**

50.   During the interview of CW1 on November 4, 2020, CW1 told SBSO Detective Browsowski that CW1 had seen MORALES with several guns.  CW1 stated that he/she had seen MORALES bring firearms in his vehicle to past drug deals, including pistols and an M4 style rifle with a drum magazine.

51.   During the interview of CW2 on June 25, 2021, CW2 told me that CW2 had seen MORALES bring firearms to past drug deals. CW2 stated that he/she had seen MORALES with a loaded .45 caliber pistol.

**G.    Further Investigation of the SUBJECT PREMISES**

1.    <u>MORALES Resided at the SUBJECT PREMISES During Deal with CW1</u>

52.   As outlined above, MORALES returned to the apartment complex of the SUBJECT PREMISES after the first controlled purchases of December 1, 2020.  He parked the Nissan in the garage he uses and then walked to one of the units within the apartment complex.  Additionally, while MORALES was texting to coordinate a second drug deal with CW1, his phone was in the vicinity of the SUBJECT PREMISES.

2.   Additional Surveillance at the SUBJECT PREMISES
      in April 2021

53.   On April 27, 2021, at approximately 9:20 a.m., SBSO investigators performed surveillance at the apartment complex of the SUBJECT PREMISES.  At approximately 11:19 a.m., SBSO investigator Michael Battisti observed a silver Toyota Tacoma pick-up truck, bearing the California license plate number 79357A3 (the "Tacoma"), park in the same garage that Investigator Battisti recognized MORALES using from the December 1, 2020, controlled purchase.  California vehicle records showed that the registered owner of the Tacoma was "Gerardo C. Morales" with an address in Rancho Cucamonga, California.  The address matches the address listed on MORALES's driver's license and the registration address of the Nissan MORALES drove during the December 1, 2020, controlled purchase.

54.   Investigator Battisti also observed the driver of Tacoma to be MORALES as MORALES walked from the garage to an unidentified apartment.  At approximately 11:56 a.m. on April 27, 2021, investigators observed MORALES walk back inside the garage, get into the Tacoma, and drive off eastbound onto Drake Street.

55.   Investigators maintained continuous mobile surveillance of MORALES.  Investigators followed MORALES as he made stops near 835 West Foothill Boulevard, Claremont, California, 101 East Foothill Boulevard, Pomona, California, and 915 West Foothill Boulevard, Claremont, California.

56.  At approximately 2:47 p.m., investigators observed MORALES park the Tacoma in the same garage that investigators observed the Tacoma leave from initially at 151 Drake Street, Pomona, California.  Investigator Battisti observed MORALES walk out of the garage up to apartment 30D and enter the apartment 30D, the SUBJECT PREMISES.

    3.   Additional Surveillance at the SUBJECT PREMISES in July 2021

57.  On June 29, 2021, at approximately 5:00 p.m., Montclair Police Department (MPD) Investigator Miguel Huerta found the Lexus parked behind the Casa Jimenez Restaurant at 921 W Foothill Boulevard, Claremont, California.  This was the same the shopping center where MORALES was observed during the April 27, 2021 surveillance.  At approximately 5:10 p.m., MPD Investigator Huerta observed a Hispanic male adult get into the driver's seat of the Lexus and a Hispanic female adult get into the passenger seat.  SBSO Investigator Ray Camacho identified that the driver of the Lexus as MORALES.  At approximately 5:15 p.m., SBSO investigator Battisti observed the Lexus pull into MORALES's garage, previously identified on April 27, 2021.  SBSO Investigator Battisti observed MORALES and an unidentified female walk out of MORALES's garage and took pictures of MORALES.  The garage has a grey roll-up door which faces east and the number "129" and "130" above it with white numbers.

58.   DEA Airwing unit watched MORALES and the unidentified female walk towards apartment building 30 towards the SUBJECT PREMISES.  DEA Airwing unit then saw MORALES and the unidentified female enter an apartment in the southeastern corner of building 30, where the SUBJECT PREMESES is located.



    4.    Recent Surveillance at the SUBJECT PREMISES in August 2021

59.   On August 13, 2021, at approximately 11:40 a.m., SBSO investigators established surveillance in a shopping center identified on multiple surveillance operations at 915 West Foothill Boulevard, Claremont, California.  At approximately 11:40 p.m., SBSO Detective Asiah Medawar observed a dark grey Hyundai Genesis, with a temporary California license plate number AX12H67 and an assigned permanent California license plate number 8XVZ460, registered to MORALES, parked in the parking lot of 915 West Foothill Boulevard.

60.   At approximately 12:10 p.m., SBSO Detective Medawar saw MORALES walk out of the rear of the business carrying a white unknown object.  SBSO Detective Medawar recognized MORALES

from previous surveillance operations.  SBSO Detective Medawar watched MORALES get into the driver's seat of the Hyundai and drove away from 915 West Foothill Boulevard.  SBSO Detective Medawar did not observe anyone else enter or exit the Hyundai. Investigators maintained continuous mobile surveillance on MORALES.

61.  At approximately 12:12 p.m., SBSO Investigator Frank Gonzalez set up surveillance at the SUBJECT PREMISES.  SBSO Investigator Gonzalez walked to the door of the SUBJECT PREMISES at Apartment 30D to confirm its location.  SBSO Investigator Gonzalez stayed at the SUBJECT PREMISES and maintained a view the door of the SUBJECT PREMISES.

62.  At approximately 12:47 p.m., SBSO Investigator Gonzalez watched MORALES arrive at the apartment complex where the SUBJECT PREMISES is located and walk into the SUBJECT PREMISES.  SBSO Detective Medawar recognized MORALES from previous surveillance operations.

63.  Based on the above facts, I believe that MORALES still resides at the SUBJECT PREMISES.

### V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

64.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug

traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and

suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

   e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

   f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

   g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

   h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often

prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

> i.   Drug trafficker often possess firearms to protect themselves from rivals, protect their controlled substances, or protect proceeds from selling controlled substances.  Dealers are likely to carry firearms to drug transactions.  Dealers are especially likely to carry firearms to drug transactions when they are meeting with someone with whom they have limited history.  Persons who possess firearms in furtherance of drug trafficking crimes are also likely to possess firearms at their homes to protect themselves from rivals, protect their controlled substances, or protect proceeds from selling controlled substances.  Often drug dealers display the firearms or post images of their so firearms on social media to deter rivals or buyers from trying to rob them.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

65.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

   66.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

       a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

       b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

67. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MORALES's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of MORALES's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

68.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

69.  For all of the reasons described above, there is probable cause to believe that MORALES has committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(v) (Distribution of 1 Gram or More of Lysergic Acid Diethylamide ("LSD")).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A.


Attested to by the applicant,
<u>DEA Special Agent Dante</u>
<u>Matthews</u>, in accordance with
the requirements of Fed. R.
Crim. P. 4.1 by telephone on
this <u>18th</u> day of August, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

PREMISES TO BE SEARCHED

The premises to be searched is located at 151 Drake Street, Apartment 30D, Pomona, California (the "SUBJECT PREMISES"). The SUBJECT PREMISES, as depicted in the photograph on the page below, is a two-story apartment located on the southeast side of the second apartment structure north of Drake Street with white exterior walls and a grey roof. Apartment 30D has a blue door with "30D" in white letters and a green background on the front entry door, which faces east.

The SUBJECT PREMISES includes a garage which is also white with a grey roof. The garage is the northernmost garage of a two-car garage building directly east of the SUBJECT PREMISES, and has a grey roll-up door which faces east and the numbers "129" and "130" above it with white numbers and a green background.

i





## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (Possession with Intent to Distribute Controlled Substances), 846 (Conspiracy and Attempt to Distribute Controlled Substances), and 843(b) (Use of Communication Facility to Commit a Felony Controlled Substance Offense) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Firearms and ammunition;

d.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

e.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages

i

over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

      f.  Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances or firearms, or drug or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

      g.  Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

      h.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

      i.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

      j.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs, firearms, or ammunition;

      k.    Contents of any calendar or date book;

      l.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations between August 6, 2020 and the date of the execution of the warrant; and

      m.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

      n.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

viii

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress Luis Gerardo Morales's, thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Luis Gerardo Morales's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto

a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x